J-S58001-16 & J-S58002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  RELINQUISHMENT OF A.F. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.F., MOTHER | |
| | No. 228 MDA 2016 |

Appeal from the Order Entered January 5, 2016
in the Court of Common Pleas of Lackawanna County
Orphans' Court at No.: A-62 of 2015

| | |
|---|---|
| IN RE:  RELINQUISHMENT OF D.F. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.F., MOTHER | |
| | No. 229 MDA 2016 |

Appeal from the Order Entered January 5, 2016
in the Court of Common Pleas of Lackawanna County
Orphans' Court at No.: A-63 of 2015

| | |
|---|---|
| IN RE:  RELINQUISHMENT OF N.F. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.F., MOTHER | |
| | No. 230 MDA 2016 |

Appeal from the Order Entered January 5, 2016
in the Court of Common Pleas of Lackawanna County
Orphans' Court at No.: A-64 of 2015

| | |
|---|---|
| IN RE: RELINQUISHMENT OF T.F. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.F., MOTHER | No. 231 MDA 2016 |

Appeal from the Order Entered January 5, 2016
in the Court of Common Pleas of Lackawanna County
Orphans' Court at No.: A-65 of 2015

| | |
|---|---|
| IN RE: RELINQUISHMENT OF D.F. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.F., FATHER | No. 242 MDA 2016 |

Appeal from the Order Entered January 5, 2016
in the Court of Common Pleas of Lackawanna County
Orphans' Court at No.: 2015-00063

| | |
|---|---|
| IN RE: RELINQUISHMENT OF A.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |

APPEAL OF: R.F., FATHER

No. 243 MDA 2016

Appeal from the Order Entered January 5, 2016
in the Court of Common Pleas of Lackawanna County
Orphans' Court at No.: A-62 of 2015

BEFORE: GANTMAN, P.J., BOWES, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED SEPTEMBER 30, 2016**

In these consolidated and related appeals[1], J.F. (Mother) appeals from the orders of the Court of Common Pleas of Lackawanna County entered January 5, 2016, that terminated her parental rights to her daughter, A.F., born in August of 2007; her son, D.F., born in March of 2003; her son, N.F., born in May of 2006; and her son, T.F., born in March of 2003 (Children). Also in these appeals, R.F. (Father) appeals from the orders of the trial court, entered on January 5, 2016, that terminated his parental rights to A.F. and D.F. We affirm.[2]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court consolidated docket numbers 228, 229, 230 and 231 MDA 2016, *sua sponte*, on March 11, 2016, and docket numbers 242 and 243 MDA 2016, *sua sponte*, on March 21, 2016. All six appeals are related because they pertain to the same parents.

[2] The trial court also terminated the parental rights of E.A., the biological father of T.F. and N.F. E.A. did not appeal those terminations.

The Lackawanna County Office of Youth and Family Services (YFS) filed petitions to terminate Mother's and Father's parental rights to the Children on September 24, 2015. The trial court aptly summarized the events that led YFS to file that petition in its opinion entered March 21, 2016. We direct the reader to that opinion for the facts of this case.

The trial court held a hearing on YFS' petitions on December 16, 2015. Testifying at that hearing, in addition to Mother, were YFS caseworker, Christin Wormuth; Scranton Counseling Center therapist, Joelle Budd; YFS visitation worker, Catrina Romano; YFS caseworker, Stephanie Herne; and the Children's grandmother, M.A. Father was incarcerated at the time of the hearing; he did not testify. The trial court entered its orders terminating Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b) on January 5, 2016. Mother filed her notices of appeal and statements of errors complained of on appeal on February 4, 2016. *See* Pa.R.A.P. 1925(a)(2)(i). Father filed his notices of appeal and statements of errors complained of on appeal on that same date. The trial court filed a Rule 1925(a) opinion on March 21, 2016. *See* Pa.R.A.P. 1925(a)(2)(ii).

Mother raises the following questions for our review:

A. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in determining [that YFS] sustained its burden of proving the termination of Mother's parental rights is warranted under Sections 2511(a)(1), 2511(a)(2), 2511(a)(5), and/or 2511(a)(8) of the Adoption Act?

B. Even if this Court concludes [YFS] established statutory grounds for the termination of Mother's parental rights, whether the trial court nevertheless erred as a matter of law and/or manifestly abused its discretion in determining [that YFS] sustained its additional burden of proving the termination of Mother's parental rights is in the best interests of the Children?

(Mother's Brief, at 5) (unnecessary capitalization omitted).

Father raises the following questions for our review:

A. Whether the trial court erred as a matter of law or sufficiently abused its discretion in determining [that YFS] presented sufficient evidence to satisfy the grounds for termination of [ ] Father's parental rights under Section 1511(a)(8) [sic] of the Adoption Act?

B. Whether the trial court erred as a matter of law or sufficiently abused its discretion in determining [that YFS] presented sufficient evidence to satisfy the grounds for termination of [ ] Father's parental rights under Section 1511(a)(1) [sic] of the Adoption Act?

C. Even if this Court determines [that YFS] presented sufficient evidence to satisfy the grounds for termination of [ ] Father's parental rights under Sections 1511(a)(1) [sic] and/or Section 1511(a)(8) [sic] of the Adoption Act whether the trial court nevertheless erred as matter of law and/or manifestly abused its discretion in determining that termination of [ ] Father's parental rights is in the best interest of the [C]hild[ren]?

D. Even if this Court determines [that YFS] presented sufficient evidence to satisfy the grounds for termination of [ ] Father's parental rights under Sections 1511(a)(1) [sic] and/or Section 1511(a)(8) [sic] of the Adoption Act whether the trial court nevertheless erred as matter of law and/or manifestly abused its discretion in determining that the conditions that led to removal have not been remedied and reunification of parent and child was not imminent at the time of the hearing[?]

(Father's Brief, at 9).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence

- 5 -

presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

Here, the trial court terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). We have examined the opinion entered by the trial court on March 21, 2016, in light of the record in this matter and are satisfied that the opinion is a complete and correct analysis of this case. Accordingly, we affirm the orders of the Court of Common Pleas of Lackawanna County that terminated Mother's and Father's parental rights on the basis of the trial court's opinion.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/30/2016

Appendix D

| IN THE INTEREST OF | : | IN THE COURT OF |
| | : | COMMON PLEAS OF |
| | : | LACKAWANNA COUNTY - |
| | : | ORPHANS' COURT |
| | : | |
| | : | No. A-64-2015 |
| | : | No. A-62-2015 |
| RELINQUISHMENT OF N.F., A.F., | : | No. A-65-2015 |
| T.F. and D.F. | : | No. A-63-2015 |

## MEMORANDUM

Bisignani Moyle, J.

The present matter was before this Court on December 16, 2015 pursuant to a Petition for Involuntary Termination of Parental Rights (hereinafter "TPR"), filed by the Office of Youth and Family Services (hereinafter "Agency") on September 24, 2015. The minor children involved in this proceeding are T.F., N.F., A.F., and D.F. The biological parents of T.F. and N.F. are ▆▆▆▆▆▆▆ (hereinafter "Mother") and ▆▆▆▆▆▆. The biological parents of A.F. and D.F. are Mother and ▆▆▆▆▆▆▆ (hereinafter "Father"). Mother and Father have appealed the order dated December 23, 2015 terminating their parental rights. Mr. ▆▆▆▆ did not attend the proceedings, nor did he take an appeal. As such we will not address any issues relating to Mr. ▆▆▆▆.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 23, 2013, an Agency caseworker arrived at the ▆▆▆▆▆▆▆ residence and found the three (3) older children home alone[1]. The Agency had been involved with

---

[1] This was the second time, during the week of July 23, 2013, the children had been found to be at the home without adult supervision. Caseworker Wormuth testified Caseworker Gleason arrived at the home and found the minor children alone earlier in the week as well, but the minor children were not removed at the time.

1

the family since September of 2010 relative issues relating to a lack of parental supervision. (N.T. 12/16/15 at p. 12.) On July 23, 2013 the minor children were removed from Mother's care. Father was not living with Mother at the time of the removal. *Id*. at p. 42. His whereabouts were unknown. *Id*. The Agency twice undertook diligent searches to find Father: one in August 2013 and the second in July 2014. *Id*. He was ultimately located in November 2014, while incarcerated at the Lackawanna County Prison. *Id*. Between January and April 23, 2015, the Agency was trying to establish Father's paternity of D.F. and A.F. *Id*. at p. 56. Because Father had used multiple aliases, including dates of birth and social security numbers, the Agency sought a DNA test to establish paternity of A.F. and D.F.. Agency caseworker Cristin Wormuth testified that DNA testing was also done at the request of Father. *Id*. at p. 49. On April 23, 2015, the DNA testing established Father to be biological father of A.F. and D.F..

At the time of the filing of the Petition for Termination for Parental Rights, Father was incarcerated on a parole violation.[2] By way of brief background, he was originally arrested in February 2011 for Endangering the Welfare of a Child. On that date, Scranton Police Officers responded to the home and found the children home alone. Mother was at work on that day and consequently was not arrested. She was, however, determined to be an indicted perpetrator by omission because of this incident. *Id*. at p. 32. The children

---

[2] From the testimony presented it appeared Father absconded from probation and/or parole and was not located until he was placed at the Lackawanna County Prison in November 2014. *Id*. at p. 22. The only testimony presented on this issue was that Father was serving eighteen (18) to thirty-six (36) months. It is not clear from the testimony if the sentence he is currently serving is for a parole violation or a new offense.

2

were placed in foster care at that time and were returned to Mother approximately two or three months later.[3]

A.  ▓▓▓▓▓▓▓▓▓ (FATHER)

Ms. Wormuth was the children's caseworker from July 2014 until March 2015.[4] *Id.* at p. 7. According to her testimony, during her tenure as a caseworker, Father had no contact with his children. *Id.* at p. 14. Prior to locating Father, the only goal for him on the permanency plan was for him to contact the Agency. *Id.* at p. 16. Wormuth testified she rated compliance for Father as "none". *Id.* at p. 18. Wormuth testified she sent a permanency plan to Father's last known address, where Father's mother lived, in September 2014. The regular mail was not returned. *Id.* at p. 53. She later mailed a plan to him at the Lackawanna County Prison in November 2014. *Id.* Father never wrote or called the caseworker seeking information about his minor children. *Id.* In fact, Wormuth first met Father when he was transported to court to attend a Permanency Review Hearing on January 12, 2015. *Id.* at p. 55.

Father has not had any contact with the children since sometime prior to July 23, 2013, other than seeing them in court at the January 2015 hearing. The children have been in foster care continuously since July 23, 2013. At the time of the hearing, they had been in placement for thirty (30) months.

---

[3] The caseworker did not offer testimony as to what date the children were returned to Mother. However, she testified they were returned after two (2) or three (3) months. *Id.* at p. 46.

[4] Wormuth testified the Agency has been involved with the family since 2010. *Id.* at p. 47. She further testified Father had knowledge of the Agency's involvement since that time. *Id.*

3

B.  ███████████ (MOTHER)

The Agency called three caseworkers during the December 16, 2015 hearing: Wormuth, Catrina Romano, and Stephanie Herne. Romano was the supervised visitation caseworker from January 15, 2014 through December 15, 2015. *Id.* at p. 101. Herne replaced Romano as the supervised visitation caseworker and began observing visitation in February of 2015 until the time of the hearing. *Id.* at p. 120.

During the pendency of this action, all of Mother's visits have been supervised at the Agency. Wormuth testified there were continued concerns about visitation because Mother did not engage the children. She testified Mother had to be directed to play with her children, and to stop texting on her phone. *Id.* at p. 18. During visits, Mother would say inappropriate things in front of the children. Specifically, she would talk about the case which caseworkers asked her not to do. *Id.* at p. 19.

Wormuth further testified in her opinion, Mother demonstrated a lack of empathy for the minor children and did not have a good understanding of age-appropriate expectations for them. *Id.* at p. 18. For example, Mother referred to D.F. as "Satan" because he was "acting out". *Id.* at p. 22. At the time, D.F. was just three (3) years old. *Id.* at p. 24. She also told A.F. she was a "demon" because she looked like D.F., and they had the same father. *Id.* at p. 23. Mother was repeatedly asked to stop calling the children "Satan" and "Demon." *Id.* Although the children did not express much of a reaction, they usually ran away. *Id.* at p. 24.

Wormuth testified she tried to get Mother to play with the children, but she would not comply. On one occasion, Mother stood next to the door while the children played in the yard. *Id.* On another occasion, Mother told D.F. that she would not visit him

4

anymore if he did not like her. D.F. ran away. *Id*. Again, he was three (3) years old at the time.

The next caseworker called to testify was Ms. Romano. She supervised weekly visits between Mother and the minor children. In total, Romano supervised twenty-seven visits. *Id*. at p. 102. Mother cancelled six visits because she was ill. *Id*. Romano testified that Mother struggled in the visits because she lacked empathy for her children. *Id*. at p. 103. She, too, did not have age-appropriate expectations for the children and struggled with parent-child role reversal. *Id*. She often had inappropriate conversations and involvement with her children. For example, Romano testified that Mother once discussed her job at a nursing home and how she watched people pass away in front of her Minor Children. *Id*. at p. 104. She also spent one visit making a puzzle by herself. *Id*. When Romano suggested she play with her children, Mother indicated she was in the middle of the puzzle. *Id*. Later, Romano suggested Mother get on the floor and play blocks with the minor children, but Mother stated that she did not want to get her pants dirty. *Id*.

During another visit, Mother sat at a table while the children ran through the hallways at the visitation center. When Romano asked her where D.F., the youngest child, was located, Mother said she did not know. *Id*. Romano expressed the importance of knowing where her children were at all times, but Mother became upset with Romano. *Id*. at p. 105. At times during visits, Mother would yell at Romano in front of the children, which would cause the children to become upset and cry. *Id*. The children would run to the foster parents and ask them why their Mother was so upset. *Id*.

5

Mother expressed that she did not want to participate in any services outside of the Agency. *Id.* at p. 103-104. Ultimately, she agreed to go to the EOTC parenting program. *Id.* When Romano asked Mother about her experience with EOTC, she stated that she did not learn anything in her parenting program and that all they did was watch movies. *Id.* at p. 104.

Romano testified about an incident that took place in the courthouse on September 29, 2015. The parties had assembled for a hearing on that date. During the hearing, Romano was called to testify about how Mother's visits were progressing. *Id.* at p. 116-117. After the hearing, Mother was angry and upset and started screaming in the hallway. *Id.* She told the minor children it was their fault. *Id.* N.F. became particularly upset and hid in a closet in the hallway located on the second floor of the courthouse. *Id.* Romano testified it took several hours to coax him out his hiding place. *Id.* Ultimately, the foster mother was summoned to help soothe N.F. and was able to persuade him from the closet. *Id.* at p. 108. Mother was supposed to have a visit that same day, but it was cancelled. *Id.* at p. 107.

The next witness to testify was the visitation supervisor, Ms. Herne. She observed twenty-one visits at the visitation center. *Id.* at p. 121. Mother missed two visits on September 21, 2015 and October 19, 2015 because of training for her job and she cancelled two other visits on March 23, 2015 and August 3, 2015. *Id.* at p. 126. Herne testified Mother never requested additional visits or make up visits. *Id.* at p. 126-127.

Herne further testified that Mother did not progress throughout her tenure on the case. *Id.* Mother continued to be self-focused and not engaging with the children. For

6

example, when the children started talking about subjects like weekend activities or homework, Mother redirected the conversations to other topics like her cats, her personal life, or her new job, which tended to override what the children had to say. *Id.* at p. 121.

Herne performed both redirection and modeling behavior for Mother. *Id.* at p. 122. She explained to Mother that if something was not appropriate for the children, she attempted to redirect Mother's conversation. *Id.* However, Mother did not usually accept such redirection. *Id.* at p. 123. For example, Mother continued to question T.F. about things in his foster home and doctor's appointments for A.F. *Id.* at p. 122. Herne told Mother it was inappropriate to ask the minor children about issues relating to foster care. *Id.* Mother also called D.F. "Satan" three different times and referred to A.F. as a "demon child." *Id.* at p. 123-124. Mother told Herne "it was a joke" and did not accept Herne's efforts of redirection. Mother told D.F. that she was going to hang him from a tree "so that I know where you're at at all times." *Id.* at p. 125.

Overall, Herne's visits were line-of-sight visits. *Id.* at p. 127. The visits never progressed from line-of-sight to general supervision visits because of Mother's inappropriate comments, her refusal to accept redirection, her inappropriate expectations and her lack of empathy for the children. *Id.* at p. 128.

The next witness called to testify was Joelle Budd. Budd was employed by the Scranton Counseling Center as a therapist for adult outpatients. Since Scranton Counseling Center was a goal/task on Mother's permanency plan, Budd met with Mother on July 15, 2015 and September 1, 2015 for talk therapy sessions. *Id.* at p. 74, 76. She has been assigned as the therapist for Mother since April of 2015. *Id.* As part of that therapy, she offers Mother cognitive behavioral therapy. *Id.* at p. 75.

7

Over a period of fourteen months, Mother was scheduled for fourteen therapy sessions at Scranton Counseling Center. *Id.* at p. 78. However, Mother only showed for seven of the scheduled visits. *Id.* at p. 78. Two visits were canceled by Mother prior to the scheduled appointment. She did not appear for the other five visits. *Id.* at p. 85. Of the seven therapy sessions that she attended, two were with Budd.[5] The first was on July 15, 2015 and the second was on September 1, 2015. *Id.* Mother's first visit with Budd was designed for them to get to know each other, to discuss why Mother was sent to therapy and to help develop Mother's necessary skills. *Id.* at p. 83. Mother was able to select which skills she wanted to improve. She selected parenting skills and coping with depression. *Id.* at p. 84. Budd offered Mother anxiety management techniques and they agreed to work on Mother's anger management. *Id.* at p. 83. The second visit on September 1, 2015 was cut short because Mother said she was in a hurry. *Id.* at p. 82. Budd testified that nothing was accomplished. Budd recommended monthly visits, but Mother only attended twice. As such, Mother was never discharged from Scranton Counseling Center. *Id.*

During the two (2) visits Budd had with Mother, Mother stated that she was forced to come to therapy to work on her problems so that she could get her children back. *Id.* at p. 82. Mother stated how she got along with her children and she knew how to behave in her presence. She stated she was the only one who knew how to handle them. *Id.* at p. 83. Mother seemed motivated to regain custody of her children but seemed aggravated to have to attend therapy. *Id.* at p. 90.

---

[5] Budd did not start working at the Scranton Counseling Center until April of 2015. Id. at p. 86. Some of the fourteen (14) visits predated Budd's tenure at the Scranton Counseling Center.

Wormuth offered testimony about Mother's compliance with Scranton Counseling Center. Throughout Wormuth's tenure, there were periods of time when Mother would attend counseling. She would see a doctor and a therapist. She was diagnosed with depression and anxiety but told Wormuth she would not take any medication. There were times when she would attend her therapist appointments. Other times, she did not want to attend her appointments. *Id.* at p. 28.

Throughout Wormuth's tenure, she rated mother's compliance at times as "substantial". *Id.* at p. 17. There were other times, however, when Wormuth rated her compliance as moderate because she was not attending Scranton Counseling. *Id.* Mother's progress was later rated as minimal because of continued concerns about visitation. *Id.* at p. 18. Mother completed the Incredible Years Program, but Wormuth did not see any correlation with things she may have learned at visitation. *Id.* at p. 20. In fact, Mother told different people that she did not learn anything in the Incredible Years Program. *Id.* at p. 29. Mother stated that they "really did not learn anything" and "they just watch movies during the program." *Id.* at p. 29. Wormuth testified that this was a continuing issue throughout the case because, in her opinion, the Incredible Years program by the EOTC would help Mother make progress and better interact with the children. *Id.*

Currently, T.F. and A.F. are placed in the same foster home. They have been in their current placement since July 7, 2014. D.F. and N.F. are currently placed in kinship foster care. In Wormuth's opinion, the minor children continue to do well in their current placement settings. *Id.* at p. 10-11. The placement settings are safe and appropriate and

9

continue to be the least restrictive environment. *Id*. Wormuth also testified that the children were calm and comfortable in their settings. *Id*. at p. 26.

T.F. is doing well in school and A.F. is struggling. A.F. has struggled with retaining information and reading. *Id*. However, A.F. was born prematurely. She was taken to a pediatric neurologist and had early intervention when she was a baby. *Id*. D.F. was also born prematurely. *Id*. He used to attend Pediatria, which is a daycare for medically fragile children. He is also diagnosed with asthma. D.F. was eighteen (18) months old when he was placed in foster care. *Id*. He has been in placement for more than two-thirds of his life.

Romano testified that in her opinion Mother does not have a strong bond with her children. *Id*. at p. 129. She was focused on what she needed to do, but did not focus on the minor children's needs. *Id*. For example, if the children asked Mother to help with homework, she would change the subject and redirect it toward herself. *Id*. at p. 106. Romano stated that Mother did not interact with the children in a way that they preferred. *Id*. If they asked her a question, she did not respond to them. *Id*.

Herne also testified on the issue of bond. She stated that it appeared that the children would like to see Mother, and they appeared attached to her. *Id*. at p. 129. However, the minor children seemed more attached to her than she was toward the children. *Id*. Herne offered the following example:

> [I]nstead of carrying on conversations and hugging the children and kissing the Minor Children, it's talking about Mother's life, and what Mother is doing outside of the visits, and what Mother does on holidays, instead of specific questions of "Tell me about your holidays.", "What have you done?", "What did you get?", "What do you like?".

*Id*. at p.129.

10

## DISCUSSION

The statutory grounds for termination of parental rights are set forth in 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

"(a) General Rule – The rights of a parent in regard to a child may be terminated after a petition [is] filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations – The court, in terminating the rights of a parent, shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed…the court shall not consider any effort by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition."

11

In determining whether to terminate the rights of a parent, both the statute and Pennsylvania case law require a two-pronged analysis. 23 Pa.C.S. § 2511; In Re Adoption of J.M., 991 A.2d 321, 323 (Pa.Super. 2010). First, the Court must find, by clear and convincing evidence, that the parent's conduct warrants the termination of parental rights. 23 Pa.C.S. § 2511(a); In Re L.M., 923 A.2d 505, 511 (Pa.Super. 2007). Once this burden has been met, the Court must then engage in a "best interests" analysis to determine whether terminating the parent's rights would properly serve the welfare and needs of the child. 23 Pa.C.S. § 2511(b); In Re L.M., 923 A.2d at 511.

In the case at hand, with respect to the first prong, the Agency has alleged Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a),(1),(2),(5), and (8). The Agency has alleged Father's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a),(1),(2),(5), and (8). Additionally, the Agency has alleged statutory grounds for termination exist for both parents pursuant to 23 Pa.C.S. § 2511(b).

## APPLICATION

A. ▓▓▓▓▓▓▓▓ (MOTHER)

This Court finds the Agency has satisfied its burden of proof by establishing, by clear and convincing evidence, Mother's parental rights should be terminated pursuant to each subsection of 23 Pa.C.S. § 2511(a) alleged. The facts in this case clearly support the Agency's petition. Due to a lack of parental supervision, the Agency had been involved in this case since 2010. In February 2011, Scranton Police Officers responded to the home to find T.F., N.F., and A.F. home alone.[6] At the time, the minor children were seven (7), four (4), and three (3) years of age, respectively. Father was arrested for

---

[6] D.F. had not yet been born.

12

Endangering the Welfare of Children. Mother was found to be an indicated perpetrator of abuse/neglect and the children were placed in foster care. They were returned to Mother's care two or three months later. The Agency continued to provide services to the family. During the week of July 23, 2013, caseworker Lindsey Gleason made two unannounced visits to the home and found the three older children home alone on both occasions.[7] On the second incident, on July 23, 2013, the children were removed and placed into foster care, where they have remained for the past thirty months.

During the pendency of the case, Mother was requested to attend Scranton Counseling Center, attend parenting classes at the EOTC, and visit with her children. Unfortunately, her compliance with the Scranton Counseling Center was sporadic at best, leaving Mother with unaddressed mental health issues contributing to her lack of progress. Furthermore, while Mother completed the Incredible Years Program, she did not demonstrate any learned behaviors or skills during her visits.

Mother and the children have been visiting each week at the visitation center for thirty months. In all that time, Mother's visits have never progressed from anything but line-of-sight supervision. Three separate agency workers testified about their observations of Mother's unwillingness to make progress during the visits. Despite parenting classes, caseworker modeling and redirection, Mother still engages in behaviors that cause caseworkers concern. As required for termination under 23 Pa.C.S. § 2511(a)(2), Mother's actions have evidenced an unwillingness to comply, and her children have been denied permanency for thirty months. Mother's actions have demonstrated continued incapacity, abuse, neglect, or refusal of the parent that have

---

[7] D.F. was eighteen (18) months old at the time and was at day care during the two (2) unannounced visits.

13

caused the child to be without essential parental care, control, or subsistence necessary for the minor child. The conditions which led to the removal or placement of the children continue to exist, and as such termination of parental rights would best serve the needs and welfare of the children.[8]

With respect to 23 Pa.C.S. § 2511(b), this Court finds by clear and convincing evidence the minor children's best interests would be served by terminating Mother's parental rights. Mother has not contributed to their developmental, physical, or emotional needs/ welfare, nor has she effectively remedied such conditions throughout the pendency of this case.

Romano testified, in her opinion, Mother does not have a strong bond with her children. Mother was focused on what she needed to do, rather than focusing on the needs of the children. Romano stated that Mother did not interact with them in a way that they preferred. Herne reinforced Romano's opinion by stating the children appeared more attached to her than she was toward the children. Wormuth also testified the children are settled, calm, and continue to do well in their current placement settings. They respond positively to their foster parents.

The children have been in their current placement since July 7, 2013. (N.T. 12/16/15 at p. 39.) The placement settings are safe and appropriate, and they continue to be the least restrictive environment for the Minor Children. The primary considerations of the children, including their developmental, physical, emotional needs, and welfare,

---

[8] In order to satisfy its burden of proof, the Agency need only present sufficient evidence to satisfy one of the four prongs selected. Because we find that have met their burden under subsection (a)(2), we will not address the remaining subsections.

14

favor termination of parental rights because of their current relationships with the foster parents and their progress in the placement settings.

B. ▓▓▓▓▓▓▓▓▓▓ (FATHER)

The facts in this case clearly establish by clear and convincing evidence Father's parental rights should be terminated. The Agency has been involved in this family's case since 2010. Father was living with the family at the time of their initial involvement and as such was aware of such involvement. In February 2011, Father was arrested for Endangering the Welfare of Children for leaving the minor children home alone. The Agency continued to remain involved. In July 2013, the minor children were discovered home alone and again placed in foster care. At that time, Father's whereabouts were unknown and he was no longer living with the family. The Agency, despite conducting two diligent searches for Father, was unable to locate him. He was discovered at the Lackawanna County Prison in November 2014. But for seeing the minor children in passing at a court hearing on January 12, 2015, Father has had no contact, no telephone calls, letters, or visits for at least thirty months. Father's last known contact occurred sometime prior to their placement on July 23, 2013. Furthermore, Father has been incarcerated since November 2014 and remains incarcerated. His release date is unknown. During the entire pendency of the case, Father never once contacted the Agency to inquire about his children.

As such, the evidence overwhelmingly supports termination pursuant to each of the subsections in 23 Pa.C.S. § 2511(a),(1),(2,)(5), and (8).

With respect to subsection (b), this Court finds it is in the best interest of the minor children to terminate Father's parental rights. Father has had no contribution to the

15

developmental, physical, or emotional needs/welfare of the minor children; nor has Father ever tried to remedy such conditions throughout his life.

The Minor Children have had no relationship with Father as evidenced by the lack of any contact for two and a half years. Furthermore, there is no testimony in the record establishing Father and children have any relationship. D.F. was just eighteen months old when he was placed into foster care, where he has remained for nearly two-thirds of his life. It is not known if D.F. even remembers his Father since he has not had contact for such an extended period of time.

The placement settings remain safe and appropriate, and they continue to be the least restrictive environment for the minor children. The primary considerations of the children, including their developmental, physical, emotional needs and welfare, favor termination of parental rights because of their current relationships with the foster parents and their progress in the placement settings.

## CONCLUSION

In conclusion, for the above mentioned reasons, it is the Order of this Court that the parental rights of ▓▓▓▓▓▓ with respect to T.F., N.F., A.F., and D.F are TERMINATED. It is further ORDERED and DECREED the parental rights of ▓▓▓▓ ▓▓▓▓▓ with respect to A.F. and D.F. are TERMINATED.

BY THE COURT

_____ J.
Honorable Margaret Bisignani Moyle

16